UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
PROFESSIONAL BULL RIDERS, LLC                 :
                                              :      Civil Action No. _____
                                              :
                        *Plaintiff,*          :
                                              :
        v.                                    :      **COMPLAINT FOR DAMAGES**
                                              :
INFRONT X, LLC a/k/a iX.co                    :
        f/k/a OMNIGON COMMUNICATIONS          :
                LLC                           :      **JURY TRIAL DEMANDED**
                                              :
                                              :
                        *Defendant.*          :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 Plaintiff Professional Bull Riders, LLC ("PBR"), for its complaint against Infront X, LLC, also known as iX.co and formerly known as Omnigon Communications LLC, ("iX"), states as follows:

 1. In early 2018, PBR hired software contractor iX to redesign the architecture of PBR's website.  PBR's website is a critical part of its business model, providing updated information, merchandise, video streaming, and PBR event ticketing opportunities to tens of millions of fans of professional bull-riding.

 2. iX was entrusted with access to PBR's website, giving it effective control over this vital resource — namely, PBR's online identity and one of its primary methods of communicating with its fans to build its brand.

 3. iX's authorized access to the website was limited to implementation of the agreed-upon website design, which was required to have specific characteristics.   PBR never

authorized iX to install components that would give iX exclusive control of PBR's web-publishing capabilities or an effective monopoly on servicing the website.

4.     While working on the renovation, especially in the later phases of the project in December 2018, iX planted proprietary code in critical places within PBR's website, in violation of an express provision in the parties' contract.

5.     iX had agreed in writing not to use proprietary code in the website design, and it was not authorized to do so.  The parties had agreed that the work would install only "open source" code elements, of a kind that had to be "mutually agreed upon by the parties."

6.     In a meeting on April 18, 2018, in fact, the parties explicitly agreed that the content management system ("CMS") would be "Drupal 8."  This open-source platform was intended to make it possible for any web professional to maintain and upgrade the site, and allow PBR to hire other companies in the future to service and update the website architecture.

7.     iX's approach to business in recent years has centered on creating long-term dependencies in its customers:  it touts the advantages of continuous enhancing for web products, long after a redesign, through its "Corebine" software platform.  But PBR did not sign up for this kind of product, or for any long-term relationship with iX.  PBR contracted for a finite redesign project to create a custom website that any web expert could later configure and upgrade to meet future needs.

8.     PBR is informed and believes, and therefore alleges, that in late 2018, after iX missed the parties' planned launch date and encountered more and more difficulties in completing the website redesign, iX breached the parties' contract, and began using Corebine out of desperation.  It purposely installed proprietary elements "off the shelf" from previous projects — which were not built from open-source code — as a shortcut to get the website launched,

because it had overrun its internal budget and was struggling to deliver the custom open-source product PBR had contracted for.

9.     In the end, iX missed the expected launch date for the new website by four months.

10.    In December, 2018, when iX claimed the website was finally ready to launch (though only in "beta" form), PBR saw that there were references to iX's proprietary "Corebine" product in the code, and confronted iX about the issue.  In a phone call on December 31, 2018, iX's president Igor Ulis gave PBR explicit assurances that the mentions of Corebine were not meaningful.  (Two weeks before, iX had cleaned out all the warnings in the code that informed a user about Corebine's "confidential" and proprietary nature.)

11.    Believing Mr. Ulis's assurances, and hopeful that a 'beta' launch of the website would allow iX to fix the many problems with the website's functioning, PBR paid iX in full the lump-sum price for its services.  The parties continued to discuss the many dozens of problems with the site that iX promised to fix.

12.    Throughout 2019, PBR struggled with a wide array of bugs and substantive problems with the functioning of the website, many of which iX ultimately failed to resolve.  As late as July 2019, despite ongoing work alongside iX (for which iX demanded more money), PBR was still maintaining a list of well over 100 problems and needs for the site, of which eight were critical (including severe disruptions to video playback), 64 were within iX's original scope, and 44 were clearly identified as "bugs."

13.    In the summer of 2019, because iX had for so many months proved unable or unwilling to fix the problems with the website's functionalities, PBR's resulting business problems led it to engage third parties to redress the design flaws and fix serious problems,

3

especially with the site's support for video (which is critical for showing event highlights to bull-riding fans — a key use of the website in enhancing PBR's brand and generating revenue from the website).  Only then did PBR realize how material iX's breaches of warranty had been.

14.    As it turned out, iX's embedded proprietary code and its highly defective design makes it nearly impossible (and prohibitively expensive) to reconfigure the website or to properly address the deficiencies that iX left unresolved.  In addition, iX had made any update to the website dependent on two third-party products, which were not contemplated and were distinct from the two products specified in the contract.  This meant that, in order to update its own website, PBR needed to use logins that iX controlled in order to access development platforms that iX housed.

15.    In these two ways, virtually impenetrable code elements effectively gave iX a monopoly on servicing the PBR website, and the ability to hold it hostage and prevent it from being improved, fixed, or reconfigured.

16.    Worse, the embedded Corebine elements in the code are self-perpetuating:  their proprietary nature makes it extremely difficult for any other party to remove these digital "padlocks" or reconfigure the PBR website in any meaningful way.  PBR has already spend tens of thousands of dollars having third parties attempt to work around and eradicate the proprietary code.

17.    When confronted with the issue, iX failed and refused to remedy the situation.  Meanwhile, site functionality continued to degrade, and video playback stopped working altogether.  In addition, PBR has been unable to adjust advertising configurations, a problem that is ongoing and has caused it a hard-dollar loss of over $42,000.

18.     When PBR learned the whole truth about the digital Corebine "padlocks" that iX had embedded into the architecture of the website, it wrote to iX to identify a material breach of contract.  On August 7, 2019, PBR asked for a refund, and it set out to hire a different contractor to redo the project:  it needed to replace the Corebine-tainted architecture, liberate PBR from the iX-controlled workflow logins, and receive the open-source product for which PBR had contracted.

19.     iX again refused to remedy the situation, and made no offer of any refund. Instead, it retaliated for PBR's complaints by taking the website itself hostage.

20.     On the morning of August 13, 2019, PBR learned that iX had disabled PBR's logins to its development platforms, locking PBR out of the critical compiling tools that iX had designed into the web-update workflow.  Though the logins were briefly reinstated, iX then locked PBR out again, claiming it had no obligation to provide any more services.  To this day, although it is now scrambling to overhaul the workflow with new providers, PBR is unable to publish significant new content through the workflow that iX designed.

21.     As a result of iX's retaliatory action — which amounts to a show of force in response to a refund request from a highly dissatisfied customer — PBR's website is degrading, and it cannot fix or reconfigure its communications with its customers in any significant way. Only in recent days have new contractors found workarounds to enable, at great expense, a replacement of iX's design with something that will work and be administrable.

22.     PBR is informed and believes, and therefore alleges, that iX seized control of PBR's website to give it leverage in the emerging dispute over the full refund to which PBR was already entitled under several of the contract's warranties.

23.    iX's conduct has done significant harm to PBR's business, its reputation as a premier provider of athletic competitions and news, and the goodwill of its fan base.  All the value that PBR hoped to enhance by hiring iX was degraded by iX's breaches of warranty and its later retaliation.

24.    PBR seeks damages for all the harm iX has done with its contract breaches; a full refund on its contract; and compensatory damages associated with all the problems caused by iX's wrongfully embedded proprietary Corebine code.

### Parties, Jurisdiction, and Venue

25.    PBR incorporates the above preliminary statements and allegations as if rewritten here.

26.    This is an action under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) and § 1030(a)(4)&(5) and for breach of contract under New York law.

27.    Professional Bull Riders, LLC is a Delaware limited-liability company with its principal place of business in Pueblo, Colorado.  It is in the business of producing and broadcasting, in a variety of formats, elite bull-riding competitions to serve a global audience of more than forty million fans.

28.    Omnigon Communications LLC is the former name of a limited-liability company organized under the laws of Delaware.  (A different company under the name "Omnigon Communications, LLC," organized under the laws of New York, has been inactive since it was "merged out" of existence, through acquisition by Infront, in January 2016.)  PBR is informed and believes, and therefore alleges, that in May 2019 Omnigon Communications LLC was fully merged into the Infront/Wanda empire, and changed its name to Infront X, LLC.

29.     PBR is informed and believes, and therefore alleges, that Infront X, LLC, is a Delaware limited-liability company with a principal place of business in New York City, and is the renamed identity of Omnigon Communications LLC.

30.     Infront X, LLC is part of a Beijing-centered corporate conglomerate with a nerve center in Switzerland.  Affiliates of the conglomerate (known generally as "Wanda") acquired Omnigon Communications, LLC in 2016 — an acquisition completed with purchase of the final 28% in April 2019 — and have now changed its name.[1]

31.     Wanda describes iX as "a leader in the development of digital platforms and social products as well as in the provision of related professional services."

32.     Omnigon Communications LLC is a signatory to the Master Services Agreement between the parties, attached hereto as Exhibit A, ("MSA") and the Statement of Work under that MSA, attached hereto as Exhibit B ("SOW").  iX is liable under the MSA as the same entity under a new name, or in the alternative, as successor-in-interest to Omnigon Communications LLC.

33.     This Court has subject-matter jurisdiction over this matter without regard to the amount in controversy, pursuant to 28 U.S.C. §§ 1331, 1338 & 1367 and 8 U.S.C. § 1030(g).

34.     The Court has personal jurisdiction over the parties pursuant to N.Y. CPLR § 302(a) and by operation of ¶ 23 of the MSA:  "Any litigation, action, or proceeding arising out of or related to this Agreement shall be instituted in any state or federal court located within the

---

[1] In an SEC filing, Wanda describes the development of Omnigon's ownership structure as follows:  "In 2015, Wanda Culture, a subsidiary of our controlling shareholder, Dalian Wanda GCL, acquired Infront, headquartered in Zug, Switzerland, and WEH, headquartered in Tampa, Florida, and established WSC, headquartered in Beijing, China, to provide a flagship sports events, media and marketing platform in China….  A private equity firm acquired Infront in 2011 and then sold it to Dalian Wanda GCL in 2015. Since then, Infront has continued to diversify and expand, both organically and through acquisitions. … Infront acquired in January 2016 a majority stake in Omnigon ….. Infront has since increased its stake in Omnigon to 72% in February 2018 and acquired the remaining 28% in April 2019."  https://www.sec.gov/Archives/edgar/data/1771279/000104746919004153/a2239116zf-1a.htm

City of New York, Borough of Manhattan and the parties hereby submit to the jurisdiction of any such court in any such litigation, action or proceeding."

35.     Venue is also proper in this court pursuant to 28 U.S.C. § 1391(b)(2), in light of ¶ 23 of the MSA.

## Factual Background

36.     PBR incorporates the above allegations as if rewritten here.

37.     PBR's website is a critical component of its business and its primary mode of communication with its fans.  In addition to information about upcoming competitions and results, and highlights from prior competitions, it is a gateway to ticketing and streaming options to allow PBR's fans to follow the sport.

38.     Large quantities of PBR's revenue originate, in one way or the other, from interactions with the fan base (new and old) through the PBR website.

39.     Each day, an average of 50,000 pageviews are carried out by PBR fans, and that figure is doubled during event weekends.  Fans come to the website to participate in the sport in a variety of ways — seeking to buy tickets, to interact with sponsors and content, and to follow developments in the sport through the latest results and updates about its competitors.

## The Contract

40.     PBR incorporates the above allegations as if rewritten here.

41.     In February 2018, seeking to overhaul the underlying architecture of its website, PBR engaged iX by entering the MSA and SOW.

42.     In addition to assuring PBR that iX would use "qualified personnel" for its services and would "have at the relevant time, the resources, capacity, expertise and ability in

terms of equipment, software, tools, processes, and know-how to provide the Services" (MSA, Ex. A, ¶ 10(f)), iX provided the following warranties in the MSA:

> All deliverables … under this Agreement will at the time of delivery and for a period of thirty (30) days thereafter,… conform in all material respects to the warranties and other provisions of this Agreement;

and

> All software created by OMNIGON for PBR under this Agreement will be free from any disabling device.

(MSA, Ex. A, ¶¶ 10(f)&(g).)

43.    Under the MSA, "Any SOW executed on or after the Effective Date shall be incorporated into this Agreement" (MSA, Ex. A, ¶ 2), and would provide the effective warranties for that segment of the project.

44.    In turn, the SOW provides a number of warranties for the process and outcome of the website renovation:  namely, among other things,

> The Website will be developed using an ***open source*** content management system that is mutually agreed upon by the parties.

and

> The front-end user interface will be developed using an ***open source*** JS/CSS/HTML framework that is mutually agreed upon by the parties.

(SOW, Ex. B. ¶ 2(b)&(c) (emphasis added).)

45.    The boilerplate MSA also gives a license to PBR to use any code embedded in the deliverables.  (MSA, Ex. A,  ¶ 16.)  However, without the expertise in using this code, it is impossible for any PBR employee or contractor to unlock the Corebine and other "padlocks" that, as described below, iX wrongfully embedded in the design.

46.     Since PBR expected to administer the website itself with the help of third parties, it specifically contracted for extensive documentation so that it would not have to rely on iX after the renovation was complete.

> OMNIGON   [iX] will maintain and update documentation on a media and in a form, mutually agreed by the Parties, that allows PBR's personnel with requisite technical skills and experience to utilize the deliverables consistent with the intended use of the deliverable as stated in the applicable SOW.

(*Id.* ¶ 14(f).)

47.     Foreseeing the possibility that that iX's expertise would be required to bring in a new provider someday, the parties also agreed as follows:

> Upon the expiration or termination of this Agreement regardless of the reason, OMNIGON agrees to provide to PBR or to a successor third-party service provider designated by PBR with certain termination/expiration assistance to allow the Services and deliverables to continue with minimal interruption and to facilitate the orderly transfer of the Services and deliverables.

(*Id.*)  Omnigon has evaded this clause by conditioning its help on new terms of payment, and in the time it has budgeted it has failed to actually remedy any significant share of the problems its design created.  Often its demands for payment have been merely to fix issues within its original scope, or have been disproportionate to the work required (for example, in reactivating the logins iX wrongfully shut down for leverage).

48.     Although the parties expected that iX itself would fix problems in its own website design, there is no limitation on PBR's remedies if it fails to do so:  as the parties stated, "Subject to the limitations set forth in Sections 11 and 12, all remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of any Party."  (MSA

¶ 28.)  Although section 11 includes a limitation on consequential damages, it does not apply to "damages arising from any breach of … warranty."  (*Id.* ¶¶ 11(d)&(e).)

49.     The MSA provides for attorney's fees for PBR to the extent it prevails in recovering "losses… costs and expenses" resulting from "any act, omission, and/or breach by OMNIGON of its representations and warranties stated under this Agreement, a SOW, or a CO."  (*Id.* ¶ 12(a).)

### Corebine

50.     At the time of the MSA, PBR was aware that iX offered other kinds of services to other customers, through a proprietary platform.

51.     iX has repeatedly championed its "Corebine" platform in media and other formats over recent years, on the premise that the Corebine package allows iX to continue to serve its customers through a one-size-fits-all product that is upgraded automatically over the long haul.  When it does so, it consistently emphasizes that no one else can provide services that involve Corebine.

52.     Far from regarding Corebine as "open source," iX boasts that no other company can offer what Corebine does, and that Corebine enables iX (and iX alone) to provide updates and create extra value long after a redesign is complete.  It consistently refers to this software as "proprietary":

- "[In 2017] Infront Sports & Media subsidiary Omnigon [iX] at the Leaders Sport Business Summit in London introduced a ***proprietary content management system it is calling Corebine***."  iX said Corebine is unlike other systems that "required a lot of customization and retrofitting to do what they need to do."[2]

- "With Corebine, sites can be launched in 2-3 months compared to custom deployments which can take up to 6+ months to develop and build. … [iX's customer said:] 'We are

---

[2] https://www.sportsbusinessdaily.com/Global/Issues/2017/10/05/Events-and-Attractions/Leaders-Notes.aspx

11

keeping pace with innovations and quality access across our digital channels through OMNIGON's *proprietary content delivery platform, Corebine*."[3]

- One of its customers, a soccer league, tells fans they are privy to "Enhanced in-game player and team statistics for every game powered by Corebine, *Omnigon's proprietary real-time data delivery network*."[4]

- In January 2018, iX's Instagram account announced:  "OMNIGON recently launched Corebine, its *proprietary Fan Engagement Platform*."[5]

- Even Corebine's trademark application, filed by its General Counsel, describes it as a system founded on "proprietary software" in handling data.[6]

53.    Corebine code is not "open source" code under any reasonable standard. Accordingly, iX was not authorized to implant Corebine elements into either the interface or the content management system of PBR's website.  (*See* SOW ¶2(c).)

54.    PBR did not sign up to be a Corebine customer.  It contracted instead for a custom solution, independent of the Corebine system, built from "open source" code.  (*Id.*)  It only accepted the website in the end on the premise, explicitly stated by iX's president, that the design was not reliant on off-the-shelf Corebine elements, as the websites of many of iX's other customers are.

### iX Struggles to Perform, Cuts Corners, and Delivers a Defective and Undocumented Product

55.    PBR incorporates the above allegations as if rewritten here.

56.    Early on in the website project, the parties agreed on various parameters for the work, and in a number of meetings, conversations, and communications PBR explained what it needed the new custom website to look like and to do.

---

[3] https://www.omnigon.com/en/news/the-power-of-corebine-takes-mobile-tech-to-new-heights (emphasis added)
[4] https://www.asroma.com/en/news/2015/12/as-roma-launches-new-fan-inspired-official-website (emphasis added)
[5] https://www.instagram.com/p/BeBLLZEhHrY/ (emphasis added)
[6] https://trademarks.justia.com/874/24/corebine-87424322.html

57.     Among many other specifications, in a meeting on April 18, 2018 — memorialized in writing at the time — the parties "mutually agreed" pursuant to SOW ¶¶ 2(b)&(c) that the platform for the content management system would be "Drupal 8," a well-known open-source system that any future contractor would be able to work with and adapt.

58.     Over the following year, PBR struggled to perform its basic obligations under the SOW, and the launch of the new website was delayed.  Before and as it came online, it was riddled with errors that showed the haste and sloppiness of PBR's work.

59.     In the course of assessing the problems with iX's deliverables in late 2018, PBR personnel noticed some oddities in the details of the code.  Although they were focused on the functionality of the website, PBR personnel observed that there were references to the proprietary Corebine system deep in the underlying code.

60.     Provided with the code only a few days before iX's proposed launch, PBR did not have the expertise or time to assess the significance of this issue, so it directly asked iX to confirm that there was compliance with the open-source obligations of the MSA and SOW.

61.     On New Year's Eve, 2018, PBR personnel conducted a call with Omnigon personnel, including its president.  Omnigon's personnel gave PBR specific assurances that the observed mentions of Corebine and its elements were inconsequential to the overall site design, and a result of "code copying and pasting for efficiency."

62.     iX's president specifically told PBR that these supposedly superficial Corebine references were not meaningful and did not mean the code was not open source.  He said these minor references would not prevent PBR or its developers from making adjustments to the overall site.

63.     Thus PBR was led to believe that the Corebine references were essentially meaningless.  On that basis it was willing to move forward with attempting to salvage the deliverables and make them functional.  It now understands that it was misled.

64.     Outside experts have now confirmed that Corebine is integral to the website that PBR actually received.  Indeed, the word "Corebine" itself appears in the code more than 4,000 times.

65.     Time and again, when new providers have attempted to remedy the problems with the website — especially its critical video playback functions — they have been stymied by the emplacement of Corebine modules and elements that are completely unfamiliar, are nonstandard to the industry, and cannot be manipulated without massive additional learning and expense.

66.     iX has offered a number of shifting and contradictory excuses for this warranty breach, and refuses to explain what makes Corebine or the modules that it provided for PBR's interface and content-management system "open source."  While suggesting that PBR to study the source code for Corebine itself, it provided virtually no documentation for any part of the website, and simply invited PBR to ask questions to learn how to manipulate the unworkable product it provided.

67.     A key promise in the MSA, reflecting standard industry practices, was broken in a way that solidified the harm iX did to PBR with its intentional installation of unworkable code: a complete lack of documentation for the website iX delivered.  iX had promised as follows:

> OMNIGON will maintain and update documentation on a media and in a form, mutually agreed by the Parties, that allows PBR's personnel with requisite technical skills and experience to utilize the deliverables consistent with the intended use of the deliverable as stated in the applicable SOW.

(MSA ¶ 12(f).)

68.     Far from keeping this promise, iX delivered virtually no documentation of any kind, and has left PBR stranded with neither the custom, open-source design nor the information about its own website that it contracted for.   Because of the complete lack of product documentation, PBR has been forced to start over with a new provider and contract for a complete website redesign, just a few months after the beta launch of iX's deeply defective product.

69.     In the last month, iX has taken advantage of its own breach in failing to provide documentation to make PBR self-sufficient.   It has exploited that state of affairs by cutting off PBR logins to the iX resources PBR was forced to use, for lack of the industry-standard documentation iX was supposed to create and deliver.   iX's breach made its own coercive conduct in recent weeks possible.   Worse, it developed excuses for its own shoddy work through using deception in implanting unauthorized elements into PBR's code, failing to document them to allow PBR to work with or around them, and then mischaracterizing the harmful effect they would have.

70.     Extensive business harm has been done by iX's warranty breaches, its failures of workmanlike performance, and its deceptive planting of harmful code into PBR's website.

**COUNT ONE: BREACH OF CONTRACT / BREACH OF WARRANTY**

71.     PBR incorporates the above allegations and statements as if restated here.

72.     The MSA and SOW, taken together, were a valid and binding contract.

73.     PBR substantially performed all its obligations under the MSA and SOW, including making full payment.

74.     Omnigon extended warranties under the MSA, including the following promises about the website product it would deliver:

> All deliverables created solely by OMNIGON under this Agreement will at the time of delivery and for a period of thirty (30) days thereafter, be free from material errors in operation and performance, provide the functions and features and operate in the manner described, and conform in all material respects to the warranties and other provisions of this Agreement and the specifications or other parameters contained in the business requirements documents (BRD) and designs…

75. In a list maintained over many months by PBR and shared with iX, the breaches of this warranty have been catalogued, and even though dozens of them are in the scope of the original SOW they have remained unredressed. iX has often demanded more money to fix them, on the pretense that PBR already "accepted" the product — as if launching the website in "beta" waived the long-term warranties in the documents and the designs.

76. iX also extended warranties in the SOW, including and especially the warranty at ¶ 2(c) that the content management system and interface would be "open source."

77. Unbeknownst to PBR, the website code at the time of delivery was instead extensively based upon proprietary rather than open-source materials, materially breaching the warranty.

78. PBR is entitled to a full refund, because the website is unfit for the purposes specified — including the need for it to be serviceable by third parties with basic industry knowledge and the need for it to be capable of being upgraded and enhanced in cost-effective ways. The website's defects are so severe that it must be replaced.

79. In addition, iX warranted in the MSA that "All software created by OMNIGON for PBR under this Agreement will be free from any disabling device." (MSA ¶10(g).)

80. Both the Corebine code that only iX can administer, and the workflow process requiring iX logins to navigate, are essentially disabling devices that have given iX coercive power over PBR ever since the website launched. As shown by the retaliatory disabling of

PBR's logins, iX's design allows it to disable certain functionalities of the website, including its ability to be reconfigured and upgraded, which is an additional breach of warranty.

81.     PBR has suffered and will suffer substantial monetary damages as a direct and proximate result of iX's warranty breaches as outlined above.

82.     Because iX's breach arises from a breach of warranty, the consequential-damages waiver in the MSA, by its own terms, does not apply to the resulting damages.

83.     iX is liable to PBR for damages in an amount to be proven at trial.

### COUNT TWO: BREACH OF CONTRACT / FAILURE OF WORKMANLIKE PERFORMANCE

84.     PBR incorporates the above allegations and statements as if restated here.

85.     The MSA, along with duties embedded in the common law, required iX to provide its services with a certain level of care and workmanlike competence.   The MSA warranted that iX would

> use qualified personnel with the requisite experience, skills, knowledge, language fluencies, training and education to perform the Services in accordance with this Agreement as contemplated herein, and has or will have at the relevant time, the resources, capacity, expertise and ability in terms of equipment, software, tools, processes, and know-how to provide the Services.

(MSA ¶ 10(e).)

86.     Analysis of the shoddy website it delivered shows that iX breached this promise. In myriad ways, the website shows iX's ignorance of standard industry practices and the capacities of the open source materials it was supposed to use to build the website.  Many of the problems with its functioning are the result of clear incompetence.

87.     In addition, iX failed to provide adequate personnel or resources to get the project done in the time allotted.   Its stinginess with its resources and budget, in violation of the warranty above, resulted in what is now obvious from the results:  hasty, corner-cutting work;

17

the recourse to unauthorized use of off-the-shelf Corebine; and the launch four months late in "beta" of a bug-ridden product.

88.     Although iX now claims PBR "accepted" the product, in truth PBR did no such thing.  It made clear that it was not accepting the website as it was, especially as it had received the code only a very short time before it was to be launched (four months late) at the end of 2018.  In addition, PBR was assured by iX's president that it was open source and that the problems with it would be resolved in the coming weeks.  On first examination of the code PBR lacked the expertise to understand all the ways that this was false, and that the proprietary Corebine lurking in the code materially violated the "open source" warranty as well as the other warranties in the contract.

89.     PBR has incurred damages and lost value from the unworkmanlike performance of iX under the parties' contract — including, as one example only, the need to pay thousands of dollars a year for a third-party image-hosting company to provide a function that could, in competent hands, have been programmed within Drupal for free.

90.     iX's breaches of contract and the incompetent nature of its performance have caused PBR damages in direct costs, hampered business and revenue opportunities, wasted time and overhead, and reduced brand value, in an amount to be proven at trial.

## COUNT THREE:  VIOLATION OF THE  COMPUTER FRAUD AND ABUSE ACT ("CFAA")

91.     PBR incorporates the above allegations and statements as if restated here.

92.     The computers running PBR's website and housing its code are connected to the Internet and involved in interstate commerce.

93.     In the course of its redesign of PBR's website, under the color of the authorizations in the MSA and SOW — but actually exceeding the scope of those authorizations

— iX purposely accessed PBR's website and transmitted on many different occasions programs and codes into the website architecture.

94.     Despite the specifications governing iX's authorization to install PBR code, many of these accesses and transmissions implanted code that was not "open source," and instead incorporated modules and elements from the unknown and proprietary Corebine system.  iX knew Corebine was not open source, and that iX had an effective monopoly on the knowhow required to service the code.

95.     iX knew and intended that the Corebine code would impair the functionalities of the existing website (including its ability to be upgraded and reconfigured), and that it would be far easier for iX itself than for anyone else to service the code and work around those impairments.  It planted this code anyway because it saved time and effort, and mitigated iX's own cost overruns.

96.     PBR is informed and believes, and therefore alleges, that iX expected that it would be hired for more money to service the Corebine-dependent website in the future.  Indeed, because PBR could not make such fixes itself iX was in a position to demand more money both in early 2019 and again in August.

97.     On December 23, 2018, in parallel with iX's need to mislead PBR about the proprietary nature of the code on the website, iX's employee Rogatnev Nikita, in the course and scope of his employment, transmitted commands into the PBR website to remove the telltale headers that showed Corebine elements in the code to be proprietary.  This step, though taken with PBR's knowledge, furthered the fraudulent conduct of Igor Ulis a week later in reassuring PBR that iX had provided the open-source product PBR contracted for.

98.     To hide its warranty breach, iX deceived PBR to induce it to accept the resulting product, which PBR did only conditionally — allowing the site to launch in "beta" form in early 2019.

99.     PBR never authorized the transmission of Corebine code into its website, and the implanted code was allowed to stay there, without PBR knowing how badly it would impair the website, only after iX falsely assured PBR that the design did not rely on Corebine functionality.

100.    Because only iX knows how to manipulate it, the Corebine code has the effect of disabling many components of the website, including its ability to be enhanced and reconfigured. This impairs the integrity of the system and information that PBR attempts to maintain to provide content to its fans and communicate with its customers, and it makes data in the form of critical streaming video unavailable to fans who come to the website to see event highlights.

101.    The business harm already done as a result of the impairment to PBR's website is unquantifiable, but well in excess of $100,000.  In addition PBR has paid or incurred obligations to third parties it hired to remedy the problems caused by the code iX implanted without authorization.  Its invoices to date for third-party services needed to remedy the impairments caused by iX's transmissions into its website already total $86,143.36.  Essentially the entire design has to be ripped out in order to get around the "padlocks" that iX installed.

102.    The deceptive and abusive conduct of iX in willfully implanting harmful code into PBR's system, hoping to be shielded by technicalities in the contract or hoping that PBR would not notice the defects until it was too late to pursue a claim, goes far beyond the risks that the parties negotiated.  This deceptive conduct is a statutory tort, eliminating many of iX's supposed contract defenses, and calls for an award of additional damages to the fullest extent of the statute.

103.    PBR seeks damages in an amount to be proven at trial, in excess of $300,000 in addition to the full contract refund, in direct costs and indirect business harm as a consequence of iX's access and transmissions into its website exceeding iX's authorization, which have harmed and caused damage to its computer system and disrupted its business.

## Prayer for Relief

In light of the above allegations, IMG  respectfully asks this Court to grant the following relief:

Damages to be proven at trial on all counts, including all consequential damages allowed by law for the wrongful implanting of unauthorized code in PBR's website;

An  award, pursuant to the relevant clause of the MSA, of PBR's reasonable attorneys' fees;

Any other relief this Court deems just and proper, including an award of costs, interest, and attorney's fees under any applicable law.

Respectfully submitted,


*/s/ David Landman*
DAVID LANDMAN (DL-2418)
BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP
39 Broadway, 25th Floor
New York, NY  10006-3039
Telephone:  (646) 798-8901
Facsimile:  (646) 798-8902
dlandman@beneschlaw.com

GREGORY J. PHILLIPS (*pro hac vice* to be filed)
JAMES E. VON DER HEYDT (*pro hac vice* to be filed)
**BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone:  216.363.4500

Facsimile:  216.363.4588
Email:  gphillips@beneschlaw.com
dmeier@beneschlaw.com
jvonderheydt@beneschlaw.com

*Attorneys for Plaintiff Professional Bull Riders, LLC*

## JURY DEMAND

Plaintiff Professional Bull Riders, LLC respectfully requests a trial by jury on all issues so triable.

*/s/ David Landman*

One of the Attorneys for Plaintiff
Professional Bull Riders, LLC